IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) KERI SIMMONS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. __26-cv-00117-CDL___ |
| | ) | |
| | ) | ATTORNEY LIEN CLAIMED |
| (1) DARIN HOWSE, | ) | |
| (2) CHASE CALHOUN, and | ) | |
| (2) CITY OF TULSA, | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, Keri Simmons, and for her Complaint against Defendants, alleges and states as follows:

## PARTIES

1.    Plaintiff Keri Simmons is an individual and a resident of Tulsa County, Oklahoma.

2.    Defendant Darin Howse ("Det. Howse" or "Howse") is a resident of the State of Oklahoma. Det. Howse was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as police officer employed by the City of Tulsa/Tulsa Police Department.

3.    Defendant Chase Calhoun ("Lt. Calhoun" or "Calhoun") is a resident of the State of Oklahoma. Det. Howse was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as police officer employed by the City of Tulsa/Tulsa Police Department.

4.    Defendant City of Tulsa ("City" or "Defendant City"), Oklahoma is a municipality located in Tulsa County, Oklahoma.  The City provides and employs the Tulsa Police Department ("TPD").

1

**JURISDICTION AND VENUE**

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

6.      This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth Amendment and/or the Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7.      The acts complained of herein occurred in Tulsa County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

**FACTUAL BACKGROUND**

8.      Paragraphs 1 to 7 are incorporated herein by reference.

9.      Plaintiff Keri Simmons is the owner of Title Clerk Services of Tulsa, a local small business that completes "Title 42" paperwork with respect to possessory lien procedures for vehicles. *See, e.g.,* 42 O.S. § 91.

10.     Ms. Simmons has been the owner and operator of Title Clerk Services of Tulsa for approximately 19 years.

11.     Ms. Simmons has no criminal record.

12.     During her nearly two-decade career performing title work, Ms. Simmons has developed a professional relationship with another local business, Miklos Towing ("Miklos").

13.     Miklos Towing often using Plaintiff's business to perform title work on vehicles Miklos tows and stores on its lot.

14.    On or about June 7, 2024, the owner of Miklos, Oscar Garcia, Sr., sent Plaintiff a text message asking her to start working on some title paperwork on three vehicles Miklos possessed, including a 2018 Jeep Grand Cherokee.

15.    Plaintiff responded she would start working on it as soon as Miklos sent her tow tickets for the vehicles.

16.    On or about June 11, 2024, Miklos texted Plaintiff a photograph of the tow ticket[1] for the 2018 Jeep and asked her to start the title 42 process for it. In reviewing the tow ticket, Ms. Simmons noted that the 2018 Jeep had been towed on February 1, 2024. This is significant because in order to comply with Title 42, a tow ticket needs to be sent within five days of impound.

17.    Ms. Simmons knew that, due to Miklos' delays that were completely out of her control, her initial submission to the State would be rejected. Ms. Simmons also knew, due to her vast experience with the Title 42 process, that she would have 30 additional days after the initial denial to correct the issues caused solely by Miklos.

18.    On or about June 25, 2024, Ms. Simmons submitted all paperwork, with respect to the 2018 Jeep, required by the State of Oklahoma to the Department of Motor Vehicles ("DMV"). This paperwork included: 1) return of sale; 2) notice of sale; 3) notice of possessory lien; 4) a second notice of possessory lien, which was required due to the number of lienholders that Ms. Simmons needed to inform; 5) proof of posting and mailing; 6) the tow ticket; 7) a photographs of the vehicle; and 8) a printout.

19.    On August 7, 2024, Ms. Simmons received the inevitable denial for the paperwork she'd submitted because Miklos had failed to send her the tow ticket within five business days of the

---

[1] The tow ticket includes the following information for a vehicle: 1) date of tow; 2) car make; 3) car model; 4) car year; 5) vehicle identification number ("VIN"); and 6) breakdown of the towing charges.

date of impound, as required by Title 42, Process 2. The denial letter allotted her 30 additional days to resubmit the paperwork in compliance with all applicable laws and regulations.

20.     In order to comply with the provisions of the denial letter, Plaintiff needed to send out the possessory lien and notice of sale to all lien holders and owners of record to let them know where the vehicle was located and how much they would need to pay Miklos in order to regain possession of the vehicle.

21.     Plaintiff sent the required notices by certified mail, and all lien holders and owners received the notices on August 12, 2024. The notices informed the lien holders and owners that if they didn't pay the required fees, including storage fees, to Miklos by August 21, 2024, Miklos would acquire ownership of the 2018 Jeep.

22.     On August 21, 2024, Plaintiff asked Miklos if any lien holder or owner attempted to regain possession of the Jeep.

23.     Miklos responded that no owner or lienholder had attempted to regain possession of the Jeep and that Miklos still had possession of the Jeep. Miklos also asked Plaintiff to put the Jeep's title in the name of "Miklos Auto Sales."

24.     Plaintiff submitted paperwork to the State of Oklahoma informing it that no lien holder or owner picked up or paid for the 2018 Jeep, as conveyed to her by Miklos. Plaintiff also asserted that Miklos had possession of the Jeep, and the vehicle's title was to be put in Miklos's name.

25.     On August 30, 2024, Plaintiff received paperwork back from the State approving her submissions related to the 2018 Jeep.

26.     Plaintiff informed Miklos of the approval, and Oscar Garcia, Jr., the son of Miklos's owner, went to Plaintiff's office and picked up the Title 42 paperwork for the Jeep.

27.     On or about September 26, 2024, Defendant Howse, a detective for the Tulsa Police Department ("TPD") allegedly met with Bonnie Dunaway, the front desk clerk for Miklos.

28.     Ms. Dunaway allegedly told Det. Howse that Miklos "intentionally failed to notify lien holders on two Jeep Grand Cherokees so that they could take possession."

29.     On October 2, 2024, the TPD Auto Theft Unit inspected Miklos and located the two Jeeps in question, one of which was the 2018 Jeep discussed herein.

30.     The Auto Theft Officers asked Oscar Garcia Jr. where the paperwork for the 2018 Jeep was, and Mr. Garcia told them that the paperwork was in the possession of Title Clerk Services of Tulsa/Ms. Simmons.[2]

31.     Later that day, Defendant Howse went to Ms. Simmons's business and spoke with her.

32.     Howse questioned Plaintiff about the work she did for Miklos regarding the 2018 Jeep, and she answered all his questions honestly.

33.     Plaintiff also made copies of all the Title 42 paperwork and gave them to Howse.

34.     Howse asked Plaintiff if she had a copy of a private property impound ("PPI") form related to the 2018 Jeep. Plaintiff said that Miklos was required to obtain the PPI form signed from the owner/manager of the business Miklos towed the vehicle from. Plaintiff, on the other hand, was not required to keep a copy of the PPI form and the PPI form was not required for Plaintiff to complete the Title 42 paperwork she did for Miklos regarding the Jeep.

35.     Plaintiff fully explained to Howse: 1) the entire Title 42 process; 2) the work that Plaintiff's business does; and 3) the business relationship between Plaintiff and Miklos. Specifically, Plaintiff explained that she was licensed to complete and submit Title 42 paperwork but Miklos was

---

[2] Miklos, however, *should* have maintained the requested documentation. Indeed, Miklos was required by law to retain all such records for seven (7) years.

not. Thus, Plaintiff simply filled out Title 42 paperwork for Miklos based on the information and documentation Miklos provided her, which she would then submit to the State. She made it abundantly clear she was not an employee of Miklos.

36. In Howse's subsequent police report and Probable Cause Affidavit, he falsely wrote that Ms. Simmons told him that she had received an unsigned copy of the PPI form. Surveillance video from Ms. Simmons's business refutes Howse's claim.

37. While questioning Plaintiff on October 2, Howse also accused her of improperly "demanding" towing fees in the paperwork she submitted. Ms. Simmons explained that *she* was not "demanding" anything. Rather, the towing charges on the forms were simply the fees the Jeep accrued while being stored at Miklos, which she was required to include on the paperwork she submitted. Any fees the owners/lien holders of the Jeep would have had to pay – if they wished to retake possession of the Jeep – would have been submitted to Miklos, which was made clear in the paperwork Plaintiff submitted to the State.

38. Plaintiff also explained while the Jeep had accrued storage fees starting on February 1, 2024, that was solely due to Miklos' delay in sending Ms. Simmons the documentation necessary for her to complete the Title 42 paperwork until June 2024. Additional storage fees accrued until August 2024, when the State approved the second submission, again due to Miklos' delays. Plaintiff further explained that she could only work with what she was given, and she had to rely on Miklos to provide her the information needed to submit Title 42 paperwork to the State.

39. Howse then asked if one of the signatures on the paperwork was Oscar Garcia Jr.'s signature. Plaintiff said that it was Oscar Garcia Sr.'s signature, and that Oscar Garcia Sr. had directed Plaintiff to sign on his behalf in order to expedite completion and submission of the paperwork. Again, Miklos and Plaintiff had a longstanding professional relationship, and it was not unusual, nor improper, for Mr. Garcia to grant Plaintiff permission to sign forms on his behalf if needed.

40.    Howse subsequently wrote in his police report and Probable Cause Affidavit that Ms. Simmons was "not aware of whose signature she is forging." Ms. Simmons, however, never made such a statement, and in fact specifically said she signed Oscar Garcia Sr.'s name with his express permission and at his directive. Plaintiff's surveillance conclusively disproves Howse's claim.

41.    On October 9, 2024, Det. Howse and Defendant Chase Calhoun arrested Plaintiff on suspicion of uttering a forged instrument and false pretense over $1000.

42.    On October 9, 2024., Det. Howse signed a sworn Probable Cause Affidavit.

43.    The Probable Cause Affidavit was executed for the purposes of charging Ms. Simmons with -- and arresting her for -- the felony of 1) Obtaining Property or Signature Under False Pretenses, over $1000, under 21 Okla. Stat. § 1542(A), and 2) the felony of Filing a False/Forged Instrument under 21 Okla. Stat. § 463.

44.    21 Okla. Stat. § 1542(A) provides as follows:

A. Every person who, *with intent to cheat or defraud another, designedly, by color or aid of any false token or writing, or other false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money or property is,* upon conviction, guilty of a Class D3 felony offense punishable by imprisonment as provided for in subsections B through F of Section 20P of this title if the value is One Thousand Dollars ($1,000.00) or more, or by a fine not exceeding three times the value of the money or property so obtained, or by both such fine and imprisonment. If the value is less than One Thousand Dollars ($1,000.00), the person is, upon conviction, guilty of a misdemeanor punishable by imprisonment in the county jail for a term not exceeding one (1) year, or by a fine not exceeding three times the value of the money or property so obtained, or by both such fine and imprisonment.

(emphasis added)

45.    21 Okla. Stat. § 463 provides: "Any person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed or registered or recorded under any law of this state or

7

of the United States, shall be guilty of a Class D1 felony offense and shall be punished by imprisonment as provided for in subsections B through F of Section 20N of this title."

46.    Det. Howse knew, when he executed the sworn Probable Cause Affidavit, that there was no evidence that Ms. Simmons intended to defraud anyone, or obtained any signature or property under false pretenses.

47.    Det. Howse knew, when he executed the sworn Probable Cause Affidavit, that there was no evidence that Ms. Simmons knowingly procured or offered a false or forged instrument to be filed with the State. Indeed, all the evidence is to the contrary.

48.    Det. Howse knowingly included multiple false and/or misleading statements in the probable cause affidavit, without which there would have been absolutely no grounds to charge Ms. Simmons with any crime.

49.    First, Det. Howse stated that "there was no record of any Notice of Possessory Lien or Notice of Sale sent at the time when this vehicle was impounded." Howse's statement was misleading in that implicitly imputed Miklos' delays onto Plaintiff.

50.    Second, Howse wrote that on the Notice of Sale to Lien Holder dated August 8, 2024, Ms. Simmons "demanded $4052.70 in charges for the vehicle to be released," and that on the second Notice of Sale to Lien Holder dated August 21, 2024, Ms. Simmons "demanded $4306.59 in charges for this vehicle to be released." Howse continued by writing that the "fraudulent demand for exorbitant storage fees ensures that owners and lien holders would not be able to recover their vehicles. Both of these fraudulently demanded storage fees that [sic] they were not able to charge per 47 OS 954 G." Again, Ms. Simmons did not "demand" anything. The paperwork that Howse reviewed clearly and unequivocally shows that Ms. Simmons properly filled out the required Title 42 paperwork, which reflected that the owners/lien holders would need to pay *Miklos* for storage fees accrued from the time the vehicle was impounded, February 1, 2024, until the date the Notice

of Sale documents were sent. Plaintiff did everything by the book based on the information Miklos provided her. The face of the documents disproves Howse's false claims as stated in the Probable Cause Affidavit.

51.     Howse also wrote, in the Probable Cause Affidavit, that Ms. Simmons "admitted that she forged the signature of "Oscar" on the Proof of Posting and Mailing, both Notices of Possessory lien forms, Notice of Sale, and the Return of Sale." This, too, was an untrue statement.

52.     Plaintiff explained to Howse that Oscar Garcia Sr. expressly permitted, and in fact, directed her to sign on his behalf.

53.     Plaintiff was arrested and taken to the Tulsa County Jail ("Jail") on October 9, 2024.

54.     Upon her arrival at the Jail, she told Jail staff that her husband was going to imminently post bail.

55.     Nonetheless, Ms. Simmons was still booked, strip searched, and placed in a cell.

56.     She spent approximately four (4) hours at the Jail and then was bailed out by her husband.

57.     On November 12, 2024, Plaintiff's arraignment was held, and she entered a plea of not guilty.

58.     Her initial preliminary hearing was scheduled for December 12, 2024, but was passed to January 31, 2025.

59.     On or about January 29, 2024, Plaintiff participated in a meeting with her criminal defense lawyer, Allen Smallwood, Jerry Truster, the Chief of the Criminal Division of the Tulsa County District Attorney's Office, and the prosecutor assigned to the case involving Miklos and Plaintiff.

60.     At the meeting, Plaintiff reiterated what she had told Det. Howse when he questioned her and explained that she had done everything by the book based on the information Miklos

provided her. She explained the Title 42 process, explained the significance of various documents, such as PPI forms, etc.

61.     She also said that she would provide the VIN numbers for every car for which she had completed paperwork for Miklos, which included approximately 24 vehicles. She further explained how to determine whether Miklos had committed any crimes using the records she maintained.

62.     During the meeting, Mr. Smallwood told the prosecutors that the entire exchange between Plaintiff and Det. Howse on October 2, 2024 was recorded by Plaintiff's surveillance cameras, and that the video unequivocally established that Det. Howse made materially false statements in the Probable Cause affidavit.

63.     At the end of the meeting, the prosecutors apologized to Ms. Simmons and told her that she never should have been arrested.

64.     The following day, all charges against Ms. Simmons were dismissed, with costs to the State, "in the best interest of justice."

65.     Ms. Simmons was wrongfully arrested and maliciously prosecuted in violation of her Fourth and/or Fourteenth Amendment rights.

66.     As a direct and proximate result, Plaintiff suffered economic and personal losses (including lost wages and attorney fees), irreparable damage to her reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

## Wrongful/Unreasonable Arrest/Seizure in Violation of the
### Fourth Amendment to the United States Constitution
### (Pursuant to 42 U.S.C. § 1983)
### (Against All Defendants)

67.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66, as though fully set forth herein.

10

68.    The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated, and no warrants shall issue, but upon probable cause...."

69.    It is well-established an arrest constitutes a seizure for purposes of the Fourth Amendment. Thus, Ms. Simmons person was "seized" for the purposes of the Fourth Amendment.

70.    In addition, the seizure of Ms. Simmons' person was unreasonable in violation of her Fourth Amendment rights.

71.    The seizure of Ms. Simmons was unreasonable as it lacked probable cause.

72.    Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

73.    Here, there was no evidence that Ms. Simmons had committed any crimes.

74.    Thus, there were no, or wholly insufficient, facts and circumstances within Det. Howse's or Lt. Calhoun's knowledge, and of which they had reasonably trustworthy information, sufficient to warrant a man of reasonable caution in the belief that any of crimes Ms. Simmons was charged had been committed.

75.    Lt. Calhoun and Det. Howse effectuated the seizure of Ms. Simmons' person without probable cause.

76.    This unreasonable seizure violated Plaintiff's Fourth Amendment rights.

77.    As a direct and proximate result of this unreasonable seizure, Plaintiff suffered damages, including, but not limited to, economic and personal losses, irreparable damage to her reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

**Malicious Prosecution in Violation of the Fourth and/or**

**Fourteenth Amendment to the United States Constitution**
**(Pursuant to 42 U.S.C. § 1983)**
**(Against Defendants Howse and City of Tulsa)**

78.     Paragraphs 1-77 are incorporated herein by reference.

79.     By executing -- and swearing to -- the Probable Cause Affidavit, Det. Howse initiated "legal process", or "brought about" the criminal action, against Plaintiff.

80.     By executing -- and swearing to -- the Probable Cause Affidavit, Det. Howse facilitated Plaintiff's continued prosecution.

81.     The criminal proceeding against Plaintiff was terminated in Plaintiff's favor, in the form the State dropping all charges, costs to the State, in the best interests of justice. Further, the prosecutors assigned to the case apologized to Plaintiff and told her that she never should have been arrested.

82.      There was no probable cause to support the seizure of Plaintiff or her continuing prosecution.

83.     As discussed *supra*, Det. Howse made numerous material, false statements in the Probable Cause Affidavit. Without those false statements, there would plainly be no probable cause for the warrant.

84.     As a direct and proximate result of this malicious prosecution, Plaintiff suffered damages, including, but not limited to, economic and personal losses, irreparable damage to her reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

### Municipal Liability

85.     Paragraphs 1-84 are incorporated herein by reference.

86.     There is an affirmative causal nexus between the violation of Plaintiff's Fourth Amendment rights and established policies or customs that were maintained by the City of Tulsa/TPD.

12

87.   The policies or customs include:

A.   A failure to adequately train and/or supervise TPD officers, including Det. Howse and Lt. Calhoun, with respect to the Fourth Amendment rights of citizens;

B.   A failure to adequately train and/or supervise TPD officers, including Det. Howse and Lt. Calhoun, with respect to probable cause to arrest as mandated by the Fourth Amendment;

C.   A failure to adequately train and/or supervise TPD officers, including Det. Howse and Lt. Calhoun, with respect to proper documentation of probable cause through probable cause affidavits utilized to initiate criminal proceedings against citizens;

D.   A specific failure to adequately train and/or supervise TPD officers, including Det. Howse and Lt. Calhoun, to not omit exculpatory information from probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

E.   An established pattern, practice and custom of TPD officers seizing persons without probable cause;

F.   An established pattern, practice and custom of TPD officers omitting exculpatory information from probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

G.   A specific failure to adequately train and/or supervise TPD officers, including Det. Howse and Lt. Calhoun, to not include false and/or misleading inculpatory information in probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

H. An established pattern, practice and custom of TPD officers including false and/or misleading inculpatory information in probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens

I. A failure to reprimand or discipline -- and/or ratifying the conduct of -- officers who violate the Fourth Amendment rights of citizens.

88.    These policies and customs were closely related to the violation of Plaintiff's constitutional rights.

89.    The City's officials acted with "deliberate indifference".

90.    The policies, practices, and/or customs described above have led to the unlawful arrests and prosecutions of numerous other individuals prior to the arrest of Plaintiff. *See, e.g., Hankins v. City of Tulsa, et al.,* Case No. 22-CV-515-TCK-CDL (N.D. Okla. 2022); *Gates, et al., v. City of Tulsa, et al.,* Case No. 24-CV-640-JFH-JFJ (N.D. Okla.).

91.    The *Hankins*[3] case, which involved a man who was falsely accused of sexual assault but acquitted at trial, revealed serious systemic deficiencies in TPD's training and supervision with respect to probable cause.

92.    First, TPD training materials discovered in *Hankins* revealed that the City/TPD provided officers training materials trivializing the importance of probable cause. To wit, a training material provided, regarding whether probable cause exists, *"Who cares[?] [I]t's up to the Magistrate to figure out if there's enough."*

93.    Additionally, there was evidence in *Hankins* that it is TPD's established practice and custom that probable cause affidavits are not reviewed or approved by a supervisor prior to filing.

---

[3] Dispositive motions in *Hankins* are currently pending before this Court.

94.    Moreover, according to TPD's former Commander of the Detective Division, there is no TPD policy, mandate, or directive requiring officers to include exculpatory information or evidence in their PC Affidavits.

95.    Further, it was routine practice within the Detective Division for a single officer, such as Det. Howse, *to be assigned to an investigation without any supervision.*

96.    Upon information and belief, consistent with TPD's established practices/customs, Det. Howse was assigned to investigate Plaintiff without any supervision. Nor did a supervisor review or approve his Probable Cause Affidavit prior to its filing.

97.    "Deliberate Indifference," on the governmental level may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. Deliberate indifference is defined differently for Eighth Amendment and municipal liability purposes. In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official. In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it.

98.    Here, the risk in maintaining the above-described policies and customs was so obvious that it amounted to deliberate indifference to the rights of persons with whom TPD come into contact. Put another way, the risk accompanied by maintaining the above-described policies and customs was so obvious that the City should have known of it.

99.    As a direct and proximate result of the above-described policies and customs, Plaintiff suffered damages, including, but not limited to, economic and personal losses, irreparable damage to her reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant her the relief sought, including but not limited to actual, compensatory and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

*Attorneys for Plaintiff*